# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

GEORGE NADER,

         *Petitioner,*

    v.

LATHAM & WATKINS,

         *Respondent.*

Civil Action No. 23-2520 (RDM)

## MEMORANDUM OPINION

Petitioner George Nader brings this action to vacate an arbitration award that was entered against him in a dispute with his former criminal defense counsel, Latham & Watkins ("Latham" or "the firm"). Dkt. 8; Dkt. 16-2. Between February 2018 and November 2019, Latham represented Nader while he was under investigation for committing various federal offenses. *See* Dkt. 16-3 at 2. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Nader maintains that Latham's ▮▮▮▮▮▮ during this period created a conflict of interest and that, due to that conflict, he ▮▮▮▮▮▮▮▮▮▮▮▮

After Nader refused to pay Latham the remaining portion of the fees owed to the firm for that representation, Latham sought to compel payment by initiating an arbitration proceeding, as contemplated by the retainer agreement. Nader, in turn, asserted counterclaims against Latham in the arbitration proceeding, alleging that Latham breached its fiduciary duty to him, that Latham's fees were excessive and unreasonable, and that the firm's work was deficient. Nader sought disgorgement of the fees that he had previously paid the firm. *Id.* at 3. The panel of

arbitrators reduced Latham's fee demand by $700,000 based on "concerns about Latham's specific bill practices," *id.* at 9, and by another 20% as unreasonable, but it otherwise sided with Latham and ordered Nader to pay Latham approximately $2.3 million in unpaid fees, $118,000 in unreimbursed expenses, and $260,000 in arbitration costs and interest, *see id.* at 11. Most notably for present purposes, the panel unanimously found "in Latham's favor on [Nader's] conflict of interest and . . . breach of fiduciary duty/loyalty claims" and, accordingly, concluded that Nader was not entitled to "disgorgement of the fees he ha[d] previously paid to Latham." *Id.* at 9.

Nader filed this action on August 29, 2023, Dkt. 1, seeking to vacate the arbitration award entered against him. Latham opposes the petition on multiple grounds, including lack of federal jurisdiction. Dkt. 22-2. But in responding to Nader's petition, Latham also asserted a counterclaim, seeking to confirm the arbitration award in the event the Court concludes that it has jurisdiction. *Id.* Nader, in turn, has moved to dismiss Latham's counterclaim on the ground that Latham has filed a duplicative motion to confirm the arbitrators' award in Superior Court, Dkt. 50. For the reasons that follow, the Court concludes that it lacks subject-matter jurisdiction over this dispute.

The Court will therefore **DISMISS** the action without prejudice. A separate order will issue.

## I. ANALYSIS

"The district courts of the United States are courts of limited jurisdiction, defined (within constitutional bounds) by federal statute." *Badgerow v. Walters*, 596 U.S. 1, 7 (2022). Here, Nader has filed a petition to vacate the arbitration panel's award pursuant to Section 10 the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.* and Section 2 of the D.C. Revised Uniform

Arbitration Act, D.C. Code § 16-4423(b).  Because the FAA "does not itself create [federal] jurisdiction," the Court requires "an 'independent jurisdictional basis' to resolve the matter." *Badgerow*, 596 U.S. at 4 (quoting *Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 582 (2008)).

Nader contends that the Court has several independent jurisdictional bases to resolve his petition to vacate the arbitration award.  He claims that the Court has diversity jurisdiction, federal question jurisdiction, and ancillary jurisdiction because this Court previously accepted Nader's guilty plea in one of the two criminal cases that the United States eventually brought against him, and Nader is still subject to Court-ordered supervision resulting from that plea.  For the reasons explained below, the Court concludes that each of those arguments fails.

**A.      Diversity Jurisdiction**

The Court's diversity jurisdiction extends to "all civil actions where the matter in controversy exceeds the sum or value of $75,000" and the dispute is between "citizens of different States."  28 U.S.C. § 1332(a).  In his amended petition, Nader argues that the Court has diversity jurisdiction over the present dispute because he is a citizen of the United Arab Emirates ("UAE"), Latham is a citizen of the State of New York and the District of Columbia, and the amount in controversy exceeds $75,000.  Dkt. 16-2 at 9.  In response, Latham argues that Nader is stateless and that his stateless status destroys diversity.  Dkt. 22-2 at 14–15.  Latham has it right.

Absent a change in parties, diversity jurisdiction is determined based "upon the state of things at the time" the action is commenced.  *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 571 (quoting *Mollan v. Torrance*, 9 Wheat. 537, 539 (1824)); *cf. Caterpillar Inc. v. Lewis*, 519 U.S. 61, 73 (1996) (jurisdictional defect may be cured by dismissing a party that otherwise

defeats diversity); see also 13E Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3608 (3d ed. 1998). Here, Nader first addressed subject-matter jurisdiction in his amended petition. Although he was incarcerated in the United States at the time, he alleged that he is a dual citizen of the United States and the United Arab Emirates ("UAE") and that he lived in UAE before he was incarcerated and "intend[ed] to return [to UAE] when released" from prison.[1] Dkt. 16-2 at 9. He further alleged that Latham is a citizen of New York and the District of Columbia. *Id.* Because a federal prisoner is treated as a citizen "of the state of which he was a citizen before he was sent to prison unless he plans to [reside] elsewhere when [released], in which event [he is treated as a citizen of] that state," *Bontoski v. Smith*, 305 F.3d 757, 763 (7th Cir. 2007) (citation omitted), Nader's own allegations establish that at the time he brought suit he was a dual U.S.-UAE citizen who intended to reside in the UAE.

Nader's dual citizenship is dispositive for present purposes. As a majority of the federal courts of appeals have uniformly recognized, for "a dual national citizen, only the American nationality is relevant for purposes of diversity under 28 U.S.C. § 1332." *Frett-Smith v. Vanterpool*, 511 F.3d 396, 399–400 (3d Cir. 2008) (citing *Coury v. Prot*, 85 F.3d 244, 250 (5th Cir. 1996); *Action S.A. v. Marc Rich & Co.*, 951 F.2d 504 (2d Cir. 1991); *Sadat v. Mertes*, 615 F.2d 1176 (7th Cir. 1980); *Mutuelles Unies v. Kroll & Linstrom*, 957 F.2d 707 (9th Cir.1992); *Las Vistas Villas, S.A. v. Petersen*, 778 F. Supp. 1202 (M.D. Fla. 1991), *aff'd*, 13 F.3d 409 (11th Cir. 1994)); *see also Jones v. Dalrymple*, 679 Fed. App'x. 668 (10th Cir. 2017); *Aly v. Hanzada for Imp. & Exp. Co., Ltd.*, 864 F.3d 844 (8th Cir. 2017); *Life of the S. Ins. Co. v. Carzell*, 851

---

[1] Latham claims that Nader is not a citizen of the UAE but rather a citizen of Lebanon. Dkt. 22-2 at 15 n.3. Nader does not respond to this contention in his reply brief. For present purposes, however, whether Nader is a citizen of Lebanon, or a citizen of the UAE, is immaterial to the diversity jurisdiction analysis.

F.3d 1341 (11th Cir. 2017); *Buchel-Ruegsegger v. Buchel*, 576 F.3d 451, 454 (7th Cir. 2009); *Feiliks Int'l Logistics Hong Kong Ltd. v. Feiliks Glob. Logistics Corp.*, 685 F. App'x 59, 62 (2d Cir. 2017). Under this rule, "diversity jurisdiction may be properly invoked only when a dual citizen's domicile, and thus his citizenship, is in a state diverse from that of adverse parties." *Coury*, 85 F.3d at 250. As a result, the only way that a dual U.S.-foreign national may invoke diversity jurisdiction is "if that national is a citizen, i.e., domiciled, in one of the fifty U.S. states." *Frett-Smith*, 511 F.3d at 400. In 1996, the Fifth Circuit noted that "there [was] an emerging consensus among" the federal courts on this rule, *Coury*, 85 F.3d at 250. Now, almost thirty years later, it is fair to conclude that the consensus is established.

Yet Nader asks this Court to depart from this consensus and to conclude that the "language of Subsection (a)(2) . . . provides for diversity jurisdiction for a dual citizen-plaintiff such as Mr. Nader, who is a citizen of a foreign country." Dkt. 16-2 at 13. He never, however, elaborates on this argument, and he appears to abandon it in his reply brief. Instead, Nader's new contention— raised for the first time in his reply—is that, after he is released from a halfway house, he "intends to rent a home in Bethesda, Maryland to serve his term of home confinement," and thus he is not stateless under § 1332(a). Dkt. 32-3 at 19–21. That argument fares no better.

At the time Nader commenced the pending action, he was incarcerated in the federal Bureau of Prisons. *Id.* As explained above, it is generally "presumed that a prisoner remains 'a citizen of the state of which he was a citizen before his incarceration, even if he is subsequently incarcerated in another state.'" *Ceasar v. Rosstead*, 593 F. Supp. 2d 91, 93 (D.D.C. 2009) (quoting *Smith v. Cummings*, 445 F.3d 1254, 1260 (10th Cir. 2006)); *see also Walker v. Dickerson*, No. 10-cv-0322, 2010 WL 2132488, at *1 (D.D.C. May 27, 2010). This presumption

can be rebutted, however, if a prisoner has concrete "plans to live elsewhere when [the prisoner] gets out;" in such a case, those courts have held that the prisoner's "domicile should be th[e] state" he intends to move to when released. *Bontkowski v. Smith*, 305 F.3d 757, 763 (7th Cir. 2002) (quoting *Singletary v. Cont'l Illinois Nat. Bank & Tr. Co. of Chicago*, 9 F.3d 1236, 1238 (7th Cir. 1993)).   There is no dispute that Nader resided in the UAE prior to being incarcerated, Dkt. 16-2 at 9, and, in his amended petition, Nader himself represents that "he lived [in the UAE] before his incarceration" and "he intends to return [to UAE] when released," *id.*  Indeed, Nader asserted: "[I]t is clear that [he] is not domiciled in any state of the United States;" that he is here "involuntarily;" and that he "intends to return to his domicile in the [UAE] upon his release from custody." *Id.* at 12.  Based on these representations, Nader is domiciled in the UAE.

In his reply brief, however, Nader argued that although he was domiciled in the UAE before he was incarcerated and although he ultimately intends to return to the UAE when he can do so, his immediate plan after being released from prison is to reside at a halfway house in Baltimore, Maryland, and then to move to Bethesda, Maryland to comply with the conditions of supervised release. Dkt. 32-3 at 21.  His counsel represented that he "was able to gather additional information from Mr. Nader and his criminal attorneys about Mr. Nader's intended residence after [his] release[] from BOP custody." *Id.*  Based on that additional investigation, he reported:

> Mr. Nader currently is serving his term of incarceration at FCI Elkton in Lisbon, Ohio.  When he is eligible for release from prison, he will next have to serve six months in a halfway house, and then six months of home confinement.  As part of the Judgment in his criminal case, this Court ordered Mr. Nader to appear for a re-entry progress hearing "within sixty days of release from incarceration or placement on supervision."  Thus, Mr. Nader will be unable to return to the UAE at least until that re-entry progress hearing is conducted, and perhaps not for much longer, as his term of supervised release is 36 months.

> Although Mr. Nader's conviction was in this Court, counsel understands that the Bureau of Prisons currently utilizes a halfway house called "Volunteers of America" in Baltimore, Maryland, for placement. Then, since he no longer owns a home in the United States, Mr. Nader intends to rent a home in Bethesda, Maryland to serve his term of home confinement.

*Id.* (internal citations omitted).

After the hearing on the pending motion, however, Nader's counsel modified his position yet again. He wrote:

> The Bureau of Prisons ("BOP") intends to transfer Mr. Nader to a halfway house in Baltimore, MD on or about October 23, 2024. If, at some point thereafter, BOP determines that Mr. Nader may serve a portion of the remainder of his sentence on home detention, Mr. Nader intends to rent an apartment in the District of Columbia from a friend in which to do so. Mr. Nader expects to be released from BOP custody and placed on supervised release in February 2025.

Dkt. 55 at 1. Thus, in summary, at the time he filed his amended petition, Nader represented that "it is clear that" he is not domiciled in any state in the United States and that he intends to return to the UAE as soon as he is permitted to do so. Dkt. 16-2 at 12. He then represented that he no longer owns a home in the United States but "intends to rent a home in Bethesda, Maryland to serve his [six-month] term of home confinement" and "perhaps" during his 36 months of supervised release, and thus will be "domiciled" in Maryland for an indefinite period of time. Dkt. 32-3 at 21. And, most recently, he represented that he actually intends "to rent an apartment in the District of Columbia" to serve "the remainder of his sentence o[f] home detention." Dkt. 55 at 1.

Three principles of law, however, doom this effort to switch horses mid-stream. First, as noted above, diversity must exist at the time an action is commenced in federal court, and, here, Nader represented at the time that he filed his amended petition that he was stateless and intended to return to UAE as soon as he is permitted to do so. Second, the party seeking to invoke the Court's jurisdiction bears the burden of demonstrating that jurisdiction is proper. *See*

*Ashtari v. Pompeo*, 496 F. Supp. 3d. 462, 467 (D.D.C. 2020). Here, although Nader's description of his plans has changed, he never represents that—at the time he commenced this action—he intended to establish a domicile in Maryland (or the District of Columbia) for the indefinite future. Nor has counsel proffered any evidence in support of any of these shifting theories of diversity jurisdiction. Third, "domicile" requires "physical presence in a state" *and* an "intent to remain there for an unspecified or indefinite period of time." *Momenian v. Davidson*, 878 F.3d 381, 389 (D.C. Cir. 2017) (quoting *Prakash v. Am. Univ.*, 727 F.2d 1174, 1180 (D.C. Cir. 1984)). Therefore, "[w]hile residency is indicative of domicile, it is not determinative." *Naegele v. Albers*, 355 F. Supp. 2d 129, 134–35 (D.D.C. 2005); *see also Shafer v. Children's Hosp. Soc'y of Los Angeles*, 265 F.2d 107, 121 (D.C. Cir. 1959) (Miller, J., dissenting) ("[D]omicile and residence are two different things."). Nader represents that he intends to remain in Maryland—or, now, the District of Columbia—for the minimum period of time necessary to comply with his term of home detention and, if necessary, during some or all of his period of supervised release. But even that representation fails to establish that he intends to make Maryland or the District of Columbia his "true, fixed, principal, and permanent home, to which [he] intends to return and remain." *United States v. Williams*, 825 F. Supp. 2d 117, 124 (D.D.C. 2011). To the contrary, he represents that as soon as he is able to return to the UAE— that is, his place of domicile before he was arrested, detained, and incarcerated—he will do so. *See Wagshal v. Rigler*, 947 F. Supp. 10, 13 (D.D.C. 1996) ("[A] prolonged absence from one's domicile is not determinative of abandonment.").

In any event, even if Nader could establish that he was a citizen of Maryland or the District of Columbia at the time he commenced this action, the Court would still lack diversity jurisdiction. To start, Nader's most recent representation posits that he intends to reside in the

District of Columbia during his remaining period of home confinement and, perhaps, during some or all of this period of supervised release. But even assuming that he was a citizen of the District of Columbia at the time he brought suit, he alleges in his amended petition that Latham "is a citizen of New York and the District of Columbia." Dkt. 16-2 at 9. Crediting Nader's own allegation, then, he and Latham are non-diverse; both are "citizens" of the District of Columbia. Although Latham has not offered any proof of its own that it is a citizen of the District of Columbia, there was no need for it to offer proof that merely confirmed what Nader himself averred.

Turning, in the alternative, to Nader's now-defunct contention that he intended to reside in Maryland at the time he commenced this action, that theory—even if still viable—would fail as well. For purposes of diversity jurisdiction, limited liability partnerships take on the citizenship of each partner. *See C.T. Carden v. Arkoma Associates*, 494 U.S. 185, 195–96 (1990) ("We adhere to our oft-repeated rule that diversity jurisdiction in a suit by or against the entity depends on the citizenship of all the members, the several persons composing such association, [and] each of its members.") (internal quotation marks and citations omitted); *see also Johnson-Brown v. 2200 M St. LLC*, 257 F.Supp.2d 175, 178 (D.D.C. 2003) (rejecting attempts to extend corporate citizenship to limited partnerships or limited-partnership associations and concluding that partnerships carry the citizenship of their members); *Burton v. Coburn*, 2005 WL 607912, at *2 (D.D.C. Mar. 16, 2005) ("Here, defendant . . . is a limited liability partnership, thus diversity jurisdiction depends on the citizenship of all its members."); *Boyd v. Kilpatrick Townsend & Stockton, LLP*, 79 F. Supp. 3d 153, 157 n.1 (D.D.C. 2015) ("Citizenship for limited liability partnerships like defendant Kilpatrick is based upon the citizenship of each of its partner members."). Nader cites no authority to the contrary.

Latham, however, has proffered a declaration from one of its partners, Kevin Chambers, who attests that he has lived in Maryland since 2018 and considers Maryland his "home state" and the place where he "intend[s] to remain." Dkt. 49-1 at 1 (Chambers Decl. ¶ 2–6). Chambers further attests that he files taxes and votes in Maryland. *Id.* The Court, accordingly, concludes that at least one of Latham's partners is a citizen of the State of Maryland (and was a citizen of the State of Maryland at the time the action was commenced). As a result, were the Court to conclude that Nader is a citizen of Maryland (or was a citizen of Maryland at the time he commenced the action), his claim of diversity jurisdiction would still fail: Latham's presence in the State of Maryland destroys diversity jurisdiction.

For all of these reasons, the Court concludes that it lacks diversity jurisdiction over the present action.

## B.    Federal Question Jurisdiction

Nader also contends that the Court has jurisdiction over his petition to vacate the arbitration award because the petition raises a federal question, namely whether Latham failed to provide conflict-free counsel in the criminal investigations against Nader as guaranteed by the Sixth Amendment. Dkt. 16-2 at 3–4. In determining whether a petition to confirm or vacate an arbitration award under Sections 9 or 10 of the FAA raises a federal question for purposes of 28 U.S.C. § 1331, the Supreme Court has made clear that courts should not "'look through' the petition to the 'underlying substantive controversy' between the parties." *Badgerow v. Walters*, 596 U.S. 1, 5 (2022) (quoting *Vaden v. Discover Bank*, 556 U.S. 49, 62 (2009)). Rather, in those cases, the courts must review the petition itself to determine whether "it alleges that federal law (beyond Section 9 or 10 itself) entitles the applicant to relief;" if so, "[28 U.S.C.] § 1331 gives the court federal-question jurisdiction." *Id.* at 9. Invoking *Badgerow*, Latham argues that Nader

is asking the Court to look through his petition to find a federal question, which the Court cannot do, and that if the Court, instead, focuses just on the dispute in question, the petition fails to raise a federal question. The Court agrees.

In defending against Latham's claim for unpaid attorneys' fees and expenses and asserting his own counterclaim for disgorgement of fees already paid, Nader argued as follows before the arbitration panel:

> Latham brought this arbitration seeking over $3 million in fees—from an incarcerated individual who has already paid it more than $3 million in fees—with less than the cleanest hands itself. Latham bears the burden of proving its unpaid fess [*sic*] are reasonable. They are not reasonable. The conflict permeated all aspects of the representation from June 4, 2019 to the end of Latham's representation in December 2019. There is nothing reasonable about ordering Nader to pay millions of dollars for representation that was impermissibly conflicted at best, and perhaps deliberately undermined at worst. To the contrary, Latham owes Nader for (1) fees he already paid for conflicted representation, and (2) fees whose reasonableness Latham cannot prove due to its own billing methods.

Dkt. 16-4 at 9. Although the arbitration panel did reduce Latham's fees by a significant amount, it rejected Nader's contention that Latham violated the D.C. Rules of Professional Responsibility by representing Nader ███████████████████████████████████████████ ███████████████████ Dkt. 16-3 at 4-9. Among other things, the panel found that Nader was aware of the potentially ████████████████; that he understood that Latham would ██████ ███████████████████████████ that he eventually received "a waiver letter" and, subsequently received "some oral warnings"; that he "was not an unsophisticated user of legal services;" that "[h]e made clear throughout [the] representation that he sufficiently understood the conflict and was content—indeed adamant—to have the firm continue ████████████████ ████████████████████ and that "Latham arranged for unconflicted counsel to represent Nader ████████████████████████████. *Id.* at 6. The panel was "unable to find,"

moreover, "that Nader suffered [an] injury [relating to the terms of his guilty plea] as a result of Latham's alleged conflict." *Id.* at 7.

In his amended petition to vacate the arbitration award, Nader argues that the arbitration panel's decision was not only wrong but "unreasonable[]" and in "manifest disregard of the law." Dkt. 16-2 at 14; *see also Kurke v. Oscar Gruss & Son, Inc.*, 454 F.3d 350, 354 (D.C. Cir. 2006) (quoting *LaPrade v. Kidder, Peabody & Co., Inc.*, 246 F.3d 702, 706 (D.C. Cir. 2001)); see also *id.* (explaining that "[m]anifest disregard . . . is an extremely narrow standard of review" that "means much more than failure to apply the correct law:" "to vacate an award under that standard, we must find that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether[,] and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." (internal quotation marks and citations omitted)). He maintains, in short, that Latham faced "a fundamental, un-waivable conflict of interest" and that by failing to address that conflict, the firm deprived him of his Sixth Amendment right to the effective assistance of counsel. Dkt. 16-2 at 14; *see also id.* at 1. He alleges that the Court should vacate the panel's award because it was "contrary to public policy, fundamental principles of attorney ethics[,] and the Sixth Amendment of the United States Constitution." *Id.*

The question presently before the Court, however, is not whether the panel erred—or whether it demonstrated a "manifest disregard of the law"—and the Court expresses no view (one way or the other) on that question. Instead, for present purposes, the question is simply whether the petition itself asserts a claim that arises under federal law, sufficient to sustain federal question jurisdiction. In Nader's view, the answer to that question is "yes" because the petition at issue in *Badgerow* sought to vacate the arbitration award on grounds of fraud, while his petition seeks to set aside the arbitration award on grounds of manifest disregard for the law.

Dkt. 32-3 at 16. Because the *Badgerow* petition turned on a state-law theory of fraud, according to Nader, there was no reason in that case to "look through" the petition to any federal law claims raised in the arbitration itself. *Id.* But, here, Nader contends, he challenges the substance of the panel's decision, and that challenge cannot be resolved without "looking through" the petition to the legal issues raised in the arbitration. For several reasons, the Court is unpersuaded.

As an initial matter, the Court is unpersuaded that, even were the Court to look through the petition to the substance of the claims raised in the arbitration, it would find a federal law claim sufficient to support federal question jurisdiction. To be sure, Nader and his experts referred to the Sixth Amendment in the course of the arbitration—although, notably, Nader's Post-Hearing Brief contains a grand total of one reference to the Sixth Amendment. Dkt. 16-4 at 25. But that does not mean that his counterclaim in the arbitration (much less his defense of Latham's claim for breach of contract) arose under the Sixth Amendment (or any other federal law). As then-Judge Jackson explained in *Lizalde v. Goldberg*, 2019 WL 2010640, at *3 (D.D.C. May 7, 2019), a former client may not maintain a civil action against his counsel "for alleged constitutional violations." Rather, "'[t]here can be no violation of the Constitution without governmental action,'" and "the law is . . . clear that criminal defense attorneys . . . are not governmental actors for purposes of constitutional claims." *Id.* (quoting *Woytowicz v. George Washington Univ.*, 327 F. Supp. 3d 105, 115 (D.D.C. 2018)). It follows that a "claim based on a 'breach of the Sixth Amendment,' due to 'ineffective assistance of counsel,' . . . is not cognizable in a civil suit for damages against a private individual, because the Sixth Amendment restrains only government, not private individuals." *Hinton v. Rudasill*, 624 F. Supp. 2d 48, 50

n.2 (D.D.C. 2009). Given this hornbook law, it is unsurprising that Nader never purported to assert a claim arising under the Sixth Amendment in the arbitration proceeding.

But even beyond that difficulty, Nader misunderstands the Supreme Court's decision in *Badgerow v. Walters*, 596 U.S. 1 (2022). As the Fourth Circuit persuasively explained in *Friedler v. Stifel, Nicolaus & Co., Inc.*, 108 F.4th 241, 246 (4th Cir. 2024), it has "long treated manifest disregard claims as distinct from the merits of the underlying issues they raise." "Judicial review of an arbitration award is 'severely circumscribed,' and is 'among the narrowest known at law.'" *Id.* (citation omitted). As Judge Wilkinson explained in his *Friedler* concurrence, the "'manifest disregard of federal law' is a flawed yardstick for determining whether federal courts have jurisdiction to review the merits of arbitral awards in the wake of *Badgerow*." *Id.* at 250 (Wilkinson, J., concurring). The standard is both "too broad," since "[p]arties to an arbitration could assert that the arbitrator 'manifestly disregarded' some federal statute in every case," and "too vague," since it would "'encourage gamesmanship,'" would "frequently 'complicate'" cases, and would "'produce appeals and reversals'" given the lack of any clear lines. *Id.* (quoting *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010)). Here, moreover, there is little downside to leaving the parties to pursue their arguments in Superior Court, since the dispute is, at base, a contract or fiduciary duty dispute that is, if anything, more closely tied to the D.C. Rules of Professional Responsibility than the Sixth Amendment.

Finally, to the extent Nader argues there is federal question jurisdiction over the petition to vacate because his Sixth Amendment claim was "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress" under the "*Grable* exception," that argument also fails. *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (citing *Grable & Sons Metal Prods., Inc. v. Darue Eng'g &*

*Mfg.*, 545 U.S. 308, 314 (2005)).  That exception is "extremely rare and only creates federal-subject matter jurisdiction in a 'special and small' category of cases," *District of Columbia v. Elevate Credit, Inc.*, 554 F. Supp. 3d 125, 145 (D.D.C. 2021) (quoting *Gunn*, 568 U.S. at 258), and this is not one of those cases.  Nader's claim does not involve a "pure issue of [federal] law;" rather, it is highly "fact-bound and situation-specific," *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 700–01 (2006), and merely references Sixth Amendment caselaw (along with the D.C. Rules of Professional Responsibility) to inform the nature of the D.C.-law duty that Latham owed its client.  *Cf. Gunn*, 568 U.S. at 261–64 (declining to resolve patent law issue, an area of exclusive federal jurisdiction, raised in the context of a legal malpractice suit because the issue was not substantial and presented a hypothetical "case within a case").  Nor is the Sixth Amendment "necessarily raised" by Nader's petition, *id.* at 258, since the petition might just as readily (if not more readily) be resolved by applying the standards set forth in the D.C. Rules of Professional Responsibility.  A defendant's Sixth Amendment rights are indisputably important.  But Nader's fee dispute with his former counsel turns, if at all, only indirectly on Sixth Amendment standards; the Court has little doubt, for example, that the dispute could be resolved based solely on the relevant facts and the D.C. Rules of Professional Responsibility.  Indeed, Nader's own petition concedes that the Court could vacate the arbitral award "due to a violation of *either* the D.C. Rules of Professional Conduct or [his] Sixth Amendment rights, or both." Dkt. 16-2 at 8 (emphasis added).  In short, he fails to satisfy the demanding standard for invoking federal jurisdiction under the *Grable* exception.

Accordingly, the Court concludes that Nader has failed to carry his burden of demonstrating that the Court has federal question jurisdiction.

## C.    Ancillary Jurisdiction

Finally, Nader argues that this Court has jurisdiction over his FAA petition as an extension of this Court's jurisdiction over his criminal case. Dkt. 16-2 at 5. In making this argument, Nader cites to several out of circuit cases in which courts have adjudicated fee disputes while presiding over the underlying criminal matter. *See* Dkt. 32-3 at 13–14. But those cases make it clear that "[a]t its heart, ancillary jurisdiction is aimed at enabling a court to administer justice within the scope of its jurisdiction." *Garcia v. Teitler*, 443 F.3d 202, 208 (2d Cir. 2006) (internal quotation marks omitted); *see also Jenkins v. Weinshienk*, 670 F.2d 915, 918 (10th Cir. 1982) ("Ancillary jurisdiction rests on the premise that a federal court acquires jurisdiction of a case or controversy in its entirety. Incident to the disposition of the principal issues before it, a court may decide collateral matters necessary to render complete justice."); *Novinger v. E.I. DuPont de Nemours & Co.*, 809 F.2d 212, 217 (3d Cir. 1987) ("Ancillary jurisdiction exists because without it the federal court neither could dispose of the principal case effectively nor do complete justice in the dispute that is before the tribunal." (quoting 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure*, § 3523, at 85 (1984))).

Nader advances no argument as to why the resolution of his dispute with Latham regarding the fees owed to the firm is necessary to the resolution of his criminal case, or even why the criminal proceeding is intertwined with his petition. As Latham notes, its representation of Nader ended in November 2019, Dkt. 16-3 at 9, before the criminal information was filed in this Court on July 6, 2020. *United States v. Nader*, No. 20-cr-103, Dkt. 1. Nader was thus represented by a different firm throughout the course of that criminal proceeding; Latham never appeared in Nader's criminal case in this Court. And although the parties raised the issue of Latham's representation of Nader in the criminal case before this Court, Nader made the

unilateral decision to withdraw that motion before the Court resolved the issue. *See United States v. Nader*, No. 20-cr-103, Dkt. 75. His plea that the public interest cries out for this Court to address the alleged conflict, accordingly, rings hollow.

Because the criminal case against Nader concluded almost a year-and-a-half ago, because he waived his right to collaterally attack his plea or sentence, and because, in any event, Latham never appeared as counsel for Nader in that criminal case, the present case differs from those in which courts have retained jurisdiction over a fee dispute in a criminal proceeding because the fee dispute implicated the court's ability to resolve the criminal case. *See, e.g., Garcia*, 443 F.3d at 209 (explaining that it was appropriate for the district court to resolve the fee dispute between criminal defendants and conflicted counsel where it is necessary "to guarantee a defendant's right to choose his own counsel," where the "criminal case is ongoing," and where doing so will "avoid the possibility of defendants becoming indigent and requiring the appointment of counsel"); *Levitt v. Brooks*, 669 F.3d 100, 103 (2d Cir. 2012) (finding it appropriate for the district court to resolve the fee dispute where the defendant in the underlying criminal case "put his legal fees in controversy by moving for release of restrained assets for the purpose of paying his legal bills," where "the underlying proceedings remained ongoing (albeit post-trial)," and where the fees implicated the court's "responsibility to ensure defendant does not become indigent and that he has representation throughout the proceedings").

The Court, accordingly, concludes that it lacks ancillary jurisdiction over Nader's petition.

## CONCLUSION

For the foregoing reasons, the Court will **DISMISS** this case for lack of jurisdiction.  A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  January 15, 2025

18